D. Maimon Kirschenbaum
Lucas C. Buzzard
JOSEPH & KIRSCHENBAUM LLP
32 Broadway, Suite 601
New York, New York 10004
Tel: (212) 688-5640
Fax: (212) 688-2548

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

----------------------------------------------------------x

**DARRYL SEELHORST and JAMES TAWN VIGIE,**

|  |  |
|---|---|
| **Plaintiffs,** | **INDEX NO:** |
| **v.** | **COMPLAINT** |
| **IMMUNOMEDICS, INC.,** | |
| **Defendant.** | |

----------------------------------------------------------x

Plaintiffs Darryl Seelhorst and James Tawn Vigie, allege as follows:

## JURISDICTION & VENUE

1.      This Court has original federal question jurisdiction over under 28 U.S.C. § 1331 over Plaintiffs' federal claims brought pursuant to the False Claims Act, 31 U.S.C. § 3729. This Court has supplemental jurisdiction over Plaintiff Vigie's Florida state law claim, as it is so related to the claims in this action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

2.      This Court also has original federal diversity jurisdiction under 28 U.S.C. § 1331 over Plaintiff Vigie's Florida state law claim because that claim is a dispute between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

Plaintiff Vigie is a citizen and resident of Florida. Defendant Immunomedics, Inc. is a public corporation that is incorporated in Delaware and headquartered in New Jersey.

3.      Venue is proper in this District because Defendant conducts business in this District, and the acts and/or omissions giving rise to the claims herein alleged took place in this District.

## PARTIES

4.      Defendant Immunomedics is a biopharmaceutical company that develops monoclonal antibody-based products for the targeted treatment of cancer. Immunomedics is a public corporation that is incorporated in Delaware and headquartered at 300 The American Road, Morris Plains, New Jersey.

5.      Immunomedics is a publicly-traded company. Immunomedics common stock is traded under the ticker symbol "IMMU" on the NASDAQ Stock Market LLC ("NASDAQ").

6.      William Conkling is and was at all relevant times Immunomedics' Vice President for Sales and Marketing.

7.      Debra Warner is and was at all relevant times Immunomedics' Senior Director of Human Resources.

8.      Plaintiff Darryl Seelhorst is a citizen and resident of Alabama who has worked in the pharmaceutical sales industry since 1999. Plaintiff Seelhorst was recruited and hired by Immunomedics in October 2018 and served as an Oncology Account Manager until Immunomedics terminated his employment on January 9, 2020.

9.      Plaintiff James Tawn Vigie is a citizen and resident of Florida who has worked in the biopharmaceutical sales industry for nearly 20 years. Plaintiff Vigie was recruited and hired

by Immunomedics in October 2018 and served as Oncology Account Manager until Immunomedics terminated his employment on January 9, 2020.

10.     Throughout the time they were employed at Immunomedics, Plaintiffs reported directly to Debbie Gentleman, the Regional Business Director for the Southeast region. Ms. Getelman reported to Rhorian Moss, the National Sales Director who, in turn, reported to Mr. Conkling.

## FACTS

### IMMUNOMEDICS'S PRODUCTS, COMMERCIAL STRATEGY, AND FDA APPROVAL ISSUES

11.     Immunomedics is a clinical-stage biopharmaceutical company that develops antibody-based products for the targeted treatment of certain cancers.  Immunomedics "manages its operations as one line of business of researching, developing, manufacturing and marketing biopharmaceutical products, particularly antibody-based products for patients with difficult to treat solid tumor and blood cancers." Prior to 2018, the Company focused the bulk of its efforts solely to research and development, rather than to marketing or sales.  Indeed, to date, Immunomedics has not yet brought any of its antibody-based products to market.

12.     In 2018, Immunomedics most advanced product was called sacituzumab govitecan ("SG").

13.     Immunomedics's entire corporate strategy was built around the "immediate priority" of commercializing SG and selling it within the United States, which first required approval of the product by the U.S. Food and Drug Administration ("FDA").

14.     In May 2018, Immunomedics submitted a Biologics License Application ("BLA") to the FDA for approval of SG as a treatment for patients with metastatic triple-negative breast cancer who had previously received at least two prior therapies for the disease. Upon approval, SG

would be the first and only antibody-drug conjugate approved for the treatment of metastatic triple-negative breast cancer.

15.    In July 2018, the FDA accepted the BLA for filing and granted the application priority review, providing January 19, 2019 as the target date for its decision on the application.

16.    In the fall of 2018 Immunomedics significantly geared up its commercial operations in anticipation of SG approval, hiring some 50 sales representatives.

17.    In early November 2018, Immunomedics hired Plaintiffs as Oncology sales representatives. During this time, Debbie Getelman contacted both Plaintiffs on behalf of Immunomedics, representing that Immunomedics was launching a first in class, blockbuster cancer therapy that was on target to be approved by the FDA by January 2019 and could be approved FDA "any day."

18.    In January 2019, however, the FDA rejected Immunomedics's application for SG in a Complete Response Letter that identified manufacturing concerns that must be addressed prior to approval of the drug.

**IMMUNOMEDICS ENTERS INTO PROMOTION AGREEMENT WITH JANSSEN BIOTECH, INC.**

19.    After the FDA rejected the approval of SG in its January 2019 Complete Response Letter, Immunomedics informed investors that its primary goal was to address the issues raised by the FDA and resubmit SG for accelerated FDA approval.

20.    As a result of the FDA's rejection of SG, Immunomedics was left with a sales team that did not have a product to market or sell.

21.    In April 2019, Immunomedics entered into a Promotion Agreement ("Agreement") with Jannsen Biotech, Inc. ("Janssen") for its drug, erdafitinib, which is also known as "Balversa." In April 2019, Balversa was approved by the FDA as a treatment for patients with advanced

bladder cancer who had tested positive for a specific gene mutation and had previously received prior therapies for the disease.[1]

22.     In public statements to its investors, Immunomedics consistently touted its Agreement with Janssen as an innovative and productive arrangement that allowed it to maintain its commercial sales team while awaiting the resubmission of SG for FDA approval.

23.     Under the terms of the Agreement, Immunomedics agreed to have its entire sales team provide product "detailing" for Balversa from the time it launched until the end of the first quarter of 2020.

24.     Despite Immunomedics's pronouncements that the Company would easily meet the goals set forth in the Janssen Agreement, in reality the Company knew that it was nearly impossible for Immunomedics to meet those goals.

25.     The population of bladder cancer patients with the specific gene mutation targeted by Balversa is small. Specifically, according to one study, of the estimated 455,400 individuals who died of cancer nationwide in 2019, only 17,670 had the specific gene mutation targeted by Balversa and, of those, only 4,064 had bladder cancer and thus were candidates for on-label use of Balversa.[2]  Thus, the candidates for on-label use of Balversa amounted to less than 1% of all cancer deaths in 2019. Moreover, these patients are generally treated by an extremely select group of physicians who are often grouped in academic institutions in major metropolitan areas.

---

[1] Specifically, as explained by Janssen in its press release for the approval of Balversa, the FDA approved the drug "for the treatment of adults with locally advanced or metastatic urothelial carcinoma (mUC) which has susceptible fibroblast growth factor receptor (FGFR)3 or FGFR2 genetic alterations and who have progressed during or following at least one line of prior platinum-containing chemotherapy, including within 12 months of neoadjuvant or adjuvant platinum-containing chemotherapy."  *See* https://www.prnewswire.com/news-releases/balversa-erdafitinib-receives-us-fda-approval-for-the-treatment-of-patients-with-locally-advanced-or-metastatic-urothelial-carcinoma-with-certain-fgfr-genetic-alterations-300831503.html.

[2] *See* Lelia Maria de Almeida Carvalho, et al., *Estimation of Percentage of Patients with Fibroblast Growth Receptor Alterations Eligible for Off-label Use of Erdafitinib*, at Results & Table 1, JAMA Network (November 22, 2019), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2755870.

26.     In December 2019, Immunomedics's National Oncology Account Manager recognized in a conversation with Plaintiff Seelhorst that the Janssen deal was "dead" and that it was nearly impossible for sales representatives to meet their quarterly sales expectations for Balversa.

**IMMUNOMEDICS REQUIRES SALES FORCE TO PROVIDE FALSE INFORMATION CONCERNING ITS COMPLIANCE WITH THE JANSSEN AGREEMENT**

27.     In the Janssen Agreement, Immunomedics agreed that its sales force would meet specified "minimum detailing requirements."

28.     "Detailing" is defined in Section 1.33 of the Agreement to mean "an in-person presentation of [Balversa] and its uses . . . made by an adequately trained sales representative during a Call to one more Health Care Professionals . . . ."[3] In addition, Section 1.18 of the Agreement defines a "Call" as an "in-person visit by an adequately trained sales representative to the office of a health care professional . . . for the purpose of promoting or presenting one of more pharmaceutical products."[4]

29.     Under the Agreement, Immunomedics was required to submit monthly detailing reports to Janssen, and Janssen is permitted to terminate the Agreement if Immunomedics fails to meet these minimum requirements.

30.     Pursuant to the Agreement with Janssen, Immunomedics's sales representatives, including Plaintiffs, were provided with "call lists" that contained the names of physicians in different "tiers" that the representatives were expected to call on a specified number of times per quarter. These lists were highly questionable for several reasons.

---

[3] *See* https://www.sec.gov/Archives/edgar/data/722830/000072283019000016/exhibit101.htm
[4] *Id.*

31.     First, the call lists contained the names of numerous physicians who did not treat bladder cancer and thus were not candidates for on-label use of Balversa. For example, while Plaintiff Vigie's call list included approximately 160 target physicians, only a fraction of those physicians treated bladder cancer, only one of those bladder cancer physicians used Balversa, and that physician prescribed the drug to only one patient.

32.     Second, the call lists contained numerous accounts that had strict "no call" policies, meaning that the representatives could not perform "in-person" calls on those accounts as specifically required by the Janssen Agreement.

33.     After being presented with these lists, members of the Immunomedics sales force, including Plaintiffs, raised numerous concerns on conference calls with Bill Conkling, Rhorian Moss, and Debbie Getelman. The majority of the representatives' concerns arose from the fact that, given the number of physicians assigned to each sales representative and the miniscule fraction of those physicians that would have any "on label" use for Balversa, it was physically and logistically impossible for most representatives to meet their target "in-person" call numbers within their assigned territories without resorting to the impermissible marketing of off label uses for Balversa. This was exacerbated by the reality that Balversa is used mainly in a small number of academic institutions in major metropolitan areas and, as a result, many territories would not contain a single physician interested in "on label" use of the drug.

34.     In response to these concerns, Immunomedics instructed its entire sales force to provide inaccurate information about the extent of the "detailing" and "calls" made by its sales representatives.

35.     To record their calls on physicians, Immunomedics's sales representatives are required to use a software program called Veeva. The only options for logging calls on Veeva are

"in-person" meetings – to log a call, a representative has to select a type of call from a drop-down menu on which the only options are a "face-to-face" meeting or a "presentation." Over the course of the multiple conference calls during which the sales representatives raised their concerns about the logistics involved with making the number of in-person calls required by the call lists, Immunomedics instructed the representatives that emails, phone calls, text messages, and literature drop-offs to physicians' offices should all be logged on Veeva as "in-person" calls.

36.    In other words, Immunomedics implemented a system under which it appeared as though Immunomedics's sales force were meeting the "detailing" and "call" requirements of the Agreement, when, in actuality, the representatives were not always capable of making "in-person" calls as the Agreement specified (and were not expected by Immunomedics to make such "in-person" calls).

37.    Moreover, sales representatives were also told on multiple occasions that they should "back-date" calls.  Specifically, on occasions when sales representatives met with multiple physicians at weekend conferences, they were instructed to back-date some calls to spread them out over multiple weekdays so that their call averages would look better.

38.    Immunomedics's practice of requiring sales representatives to provide information on Veeva by (1) logging emails, phone calls, texts, and literature drop-offs as "in-person" calls and (2) back dating calls, necessarily created numerous discrepancies between the representatives' Veeva logs, the representatives' expense reports, and the representatives' gas reimbursement cards.

39.    Immunomedics required representatives to maintain expense reports detailing all expenses the representatives incurred on behalf of their efforts for Immunomedics, which the representatives were required to submit to Immunomedics periodically for approval and

8

reimbursement. Pursuant to Immunomedics's policy, all expenses of $75 or more were to be accompanied by an "itemized receipt."  By contrast, all out-of-pocket expenses of $25 or more were to be accompanied by a "receipt" (with no requirement that it be itemized).

40.     As stated above, Immunomedics required other forms of communication (*ie.*, emails and phone calls) to be logged on Veeva as "in-person" visits with physicians.  As a result, there were numerous times when sales representatives' Veeva logs would erroneously appear as though they were physically in one part of their territory while, on the same day, their expense report indicated that they had incurred expenses hundreds of miles away.

41.     Similarly, because sales representatives were encouraged and instructed to spread out weekend calls they had made on multiple physicians, there were times when sales representatives' Veeva logs indicated that they had met with a physician on a certain weekday date (when they actually saw that physician at a weekend conference), while their expense reports showed activity in different parts of their territory on the same date.

42.     Based on Plaintiffs' conversations with other sales representatives, discrepancies between the Veeva logs and the expense reports were a common occurrence throughout the nation. In text messages sent to Plaintiffs, other Immunomedics representatives acknowledged that they regularly logged emails to physicians as "face to face" calls in Veeva. The representatives' concerns about these discrepancies were raised on multiple conference calls led by Mr. Moss and Ms. Getelman.

**PLAINTIFFS COMPLAIN ABOUT THEIR SUPERIORS' ILLEGAL AND UNETHICAL PRACTICES**

43.     From the time they were hired in November 2018 through late-August 2019, Plaintiffs and members of their team grew increasingly alarmed by the unethical and illegal conduct of their immediate supervisor, Debbie Getelman.

44.     As Regional Business Director for the Southeast, Ms. Getelman oversaw a team of approximately 8 sales representatives (including Plaintiffs) who operated in territories stretching from Maryland to Florida.

45.     During their initial training in early November 2018, when SG remained slated for possible FDA approval as a breast cancer treatment in January 2019, sales representatives (including Plaintiffs) were specifically instructed that prior to FDA approval they should not: (1) discuss SG or breast cancer when booking appointments with physicians or their staff; or (2) independently create or disseminate any talking points about breast cancer or SG.

46.     In December 2018, however, Ms. Getelman became openly annoyed with Plaintiff Vigie because he did not have appointments lined up with the leading breast cancer doctors in his territory. When Plaintiff Vigie explained that the top accounts would not book appointments without knowing what the appointment would be about, Ms. Getelman told him that he should be booking appointments with "key opinion leaders" via emails announcing Immunomedics's upcoming breast cancer drug. Ms. Getelman's instruction was directly contrary to the initial training Plaintiff Vigie had received and likely constituted illegal off-label marketing as SG had not yet been approved by the FDA.

47.     In December 2018, Plaintiff Vigie discussed with Ms. Getelman the possibility of Immunomedics's participation in an annual breast cancer charity weekend event in Jacksonville, Florida called the "Donna." Mr. Vigie was concerned about Immunomedics becoming a sponsor of the Donna because sponsorship cost $5,000 and included the placement of an Immunomedics logo on event shirts and a promotional booth to market to patients and consumers at the event.  Mr. Vigie was concerned because (1) the use of Immunomedics's logo on breast cancer event shirts could be perceived as marketing the drug for breast cancer when it had not been approved by the

FDA for that purpose, and (2) the placement of a promotional booth at the event would likely violate the directive that sales representatives not engage in pre-approval discussions about SG and breast cancer.

48.     Moreover, the Donna was held simultaneously with another event put on in Jacksonville by the Mayo Clinic, which Ms. Getelman also wanted Mr. Vigie to sponsor. It was Mr. Vigie's understanding that Immunomedics could not sponsor an event without attending it because doing so could violate the Anti-Kickback Statute. As he could not attend both events at the same time, he was concerned that his sponsorship of the event he did not attend would be an easily documented kickback to that organization.

49.     When Mr. Vigie expressed these concerns to Ms. Getelman, she became furious, asked whether there was something "wrong" with him, accused him of constantly raising issues that prevented the Company from "getting things done," and ordered him to participate in the Donna event. Ultimately, Mr. Vigie refused Ms. Getelman's directive to sponsor the Donna, believing that it would be non-compliant.

50.     In July 2019, after SG was rejected for breast cancer by the FDA and Immunomedics entered into the agreement with Janssen, Plaintiff Vigie was invited by two Janssen representatives to join them at an appointment about Balversa with Dr. Paul Crispen, a urologist at the University of Florida's Health Cancer Center. The two Janssen representatives held the titles of Key Account Manager ("KAM") and Medical Science Liaison ("MSL"). These two positions are strictly regulated in that they negotiate contracts with major accounts and discuss off-label clinical trials with physicians. Sales representatives, by contrast, are prohibited from discussing either of these issues with physicians, which meant that the appointment with Dr. Crispen was to be an introduction only.

51.     When Ms. Getelman heard about the appointment, she expressed annoyance that she had not been invited and shared with Mr. Vigie that she wanted to speak with Dr. Crispen because she had learned that SG was ahead of schedule for being indicated as a treatment for bladder cancer. This comment raised multiple red flags for Mr. Vigie, including: (1) SG had not been approved as a bladder cancer treatment and Ms. Getelman could be engaged in off-label promotion; (2) if SG were approved as a bladder cancer treatment, it would be a direct competitor of Balversa and thus Ms. Getelman could be seen as promoting a competitor in violation of the Janssen agreement at an appointment that Janssen representatives had arranged; and (3) the University of Florida had strict regulations governing industry visits that expressly forbade the discussion of pre-approval indications for drugs; and (4) the appointment was meant as an introduction only, and it would be non-compliant to promote a drug in the presence of Janssen's KAM and MSL.

52.     In light of these concerns (and others), Mr. Vigie unsuccessfully attempted to dissuade Ms. Getelman from attending the appointment. Ultimately, she went over his head and inserted herself into the appointment. This so disturbed the two Janssen representatives that they backed out of the appointment entirely.

53.     When attending the appointment, Ms. Getelman entered the University of Florida without having undergone the proper credentialing required by the University and discussed with Dr. Crispen at great length both Balversa and the use of SG for the non-approved purpose of treating bladder cancer.

54.     In early August 2019, Ms. Getelman directed Mr. Vigie to register as an attendee at a Continuing Medical Education ("CME") conference hosted by the Mayo Clinic in Florida. Shortly before the conference, Ms. Getelman informed Mr. Vigie that she and Rhorian Moss,

Immuomedics's National Sales Director, had decided to also attend the conference. Ms. Getelman informed Mr. Vigie that she and Mr. Moss did not want to pay the attendance fee and so would just "sneak in" to the event. To accomplish this, Ms. Getelman and Mr. Moss required Mr. Vigie to make duplicates of his (properly obtained) event badge.

55.     CMEs are heavily regulated, and it is strictly forbidden to promote products inside a CME. Despite this, Ms. Getelman and Mr. Moss proceeded to give a full promotional detail of Balversa to Dr. Winston Tan, the CME moderator, while he was standing at the podium.  Dr. Tan immediately became annoyed and demanded to know whether they were salespeople who were approaching him to sell products at the CME podium. After the CME, Mr. Vigie was contacted by Dr. Tan's assistant who reiterated that the doctor was extremely annoyed that he had been approached with a promotional pitch at a CME.

56.     In mid-August 2019, Ms. Getelman pressured Plaintiff Seelhorst to register at a University of Alabama Birmingham conference as an "attendee," which was much cheaper than registering as a "vendor" – the registration required to promote products at the conference.  Ms. Getelman instructed Mr. Seelhorst that, after registering as an attendee, he should surreptitiously approach physicians to promote Balversa.

57.     By late August 2019, the situation with Ms. Getelman had become intolerable to Plaintiffs and the other members of their team, all of whom had reported experiencing similar unethical and illegal practices by Ms. Getelman.

58.     At the time, Mr. Seelhorst was the "Culture Committee" representative for the Southeast team, which meant that it was his responsibility to solicit feedback and concerns from the team and funnel them to the leadership. Mr. Seelhorst thus felt it was his responsibility to report the team's numerous concerns about Ms. Getelman to her superiors.

59. Accordingly, in late August 2019, Mr. Seelhorst brought the team's concerns to Kurt Andrews, Immunomedics's Head of Human Resources. Among other issues with Ms. Getelman, Mr. Seelhorst specifically informed Mr. Andrews: (1) of Ms. Getelman's practice of sneaking into health care facilities without first undergoing the proper credentialing process; (2) that Ms. Getelman frequently required members of the team to register as "attendees" at events and then sneak in promotional displays; and (3) that Ms. Getelman often snuck into medical conferences without paying any registration fee.

60. During the conversation with Mr. Andrews, Mr. Seelhorst stated that he was speaking on behalf of the entire team, all of whom were fearful of retaliation and needed protection for coming forward. Mr. Andrews agreed, expressed the opinion that Ms. Getelman's behavior could not be corrected, and informed Mr. Seelhorst that Ms. Warner, the Senior Director of Human Resources, would handle the matter.

61. In a subsequent conversation with Ms. Warner, Mr. Seelhorst reiterated the complaints about Ms. Getelman's conduct and the team's fear of retaliation. Ms. Warner confirmed that they would be protected and that it appeared Ms. Getelman's conduct could not be "coached up."

62. Mr. Vigie made his own independent complaints about Ms. Getelman's conduct several days later. Specifically, on August 26, 2019, Mr. Vigie proactively reached out to Mr. Moss and then to Ms. Warner, both of whom had already contacted other members of the team about Ms. Getelman.

63. In his conversation with Mr. Moss, Mr. Vigie complained about Ms. Getelman's conduct set forth above involving himself. Mr. Vigie explained that it was his belief that Ms. Getelman ignored basic compliance rules and legal requirements and was jeopardizing the

approval of SG. Mr. Vigie detailed how even when he insisted on acting in a compliant manner, she would continuously pressure him to act unethically or simply go around him.

64.     Mr. Moss was very apologetic and shared that the stories shared about Ms. Getelman by other members of the team were extremely consistent with Mr. Vigie's own experiences. He also expressed the opinion that Ms. Getelman's conduct did not appear to be coachable. During his call with Mr. Moss, Plaintiff Vigie expressed a concern shared by himself and the other members of the team that the unorthodox instructions they had received as to the recording of calls on the Veeba system (*ie*., that emails, "drop offs," and phone calls could all be recorded as "in-person" meetings), could provide Ms. Getelman with ample fodder to retaliate against any representative who raised concerns about her conduct

65.     In his conversation with Ms. Warner, Mr. Vigie informed her about Ms. Getelman's conduct set forth above involving himself. During the conversation, Ms. Warner commented that there were many issues the team had raised, and the fact that the whole team expressed such consistent concerns was very rare. Ms. Warner assured Mr. Vigie that the issue would be quickly resolved, and Ms. Getelman would be "easy to get rid of" because "leopards don't change their spots." Mr. Vigie again raised his concern that, given all the discrepancies in Immunomedics's systems, it would be easy for Ms. Getelman to retaliate against any member of the team by finding minor discrepancies that everyone knew existed and the team had complained about since the inception of the Balversa deal. Ms. Warner thanked Mr. Vigie for "speaking up for the group," and asked him to reach out to other members of the team, ease their concerns about possible retaliation, and encourage them to discuss the matter with her.

66.     Several days later, Ms. Warner informed Mr. Vigie that Mr. Conkling, the Vice President of Sales and Marketing, would be handling the complaint and that the team should no longer discuss the matter with Mr. Moss because of his personal relationship with Ms. Getelman.

67.     Following these complaints, Plaintiffs were informed that Ms. Getelman had been removed from managing the team while the matter was under investigation. The team was instructed not to contact Ms. Getelman in the meantime.

**IMMUNOMEDICS PROTECTS MS. GENTLEMAN & RETALIATES AGAINST PLAINTIFFS BECAUSE OF THEIR COMPLAINTS**

68.     Over the course of September 2019, Plaintiffs were repeatedly told that no decision had yet been made as to Ms. Getelman. It was not until early October 2019 that Mr. Conkling convened a conference call with all members of the team and informed them that Ms. Getelman "deserved to be given a chance to change" and would be reinstated to her position. The entire group reiterated their displeasure. Mr. Vigie specifically expressed his opinion that Ms. Getelman's behavior put the Company and the FDA's approval of SG in jeopardy.

69.     In a separate call with Mr. Conkling later that day, Mr. Vigie reiterated that his complaint was not about Ms. Getelman's personality but instead was driven by his belief that her unethical and noncompliant behavior posed a danger to the company.

70.     Plaintiffs were the only two members of Ms. Getelman's team who had proactively raised complaints about Ms. Getelman.

71.     For approximately one month after her early October 2019 reinstatement, Ms. Getelman was on good behavior.

72.     In November 2019, Plaintiff Vigie and another OAM were asked to arrange a high-profile and important meeting between the leadership of Immunomedics and the leadership of Florida Cancer Specialists ("FCS") and American Oncology Network ("AON") to discuss

Balversa, as well as certain pricing and contracting issues. Plaintiff Vigie and Ms. Gross arranged the meeting for November 19, 2019. Representing Immunomedics at the meeting were Ms. Getelman, Mr. Moss, and Mr. Conkling.

73.     Prior to the meeting, Plaintiff Vigie and Ms. Gross informed Mr. Conkling that, as sales representatives, they were not allowed to be present for any discussions about drug pricing, purchase contracts, off-label use, or clinical trials, and would have to excuse themselves after making the introductions and before such discussions began. Mr. Conkling disagreed, ordering Plaintiff Vigie and Ms. Gross to remain in the meeting because FCS and AON were their customers and the meeting would be "smoother" with them in attendance.

74.     During the meeting, Mr. Conkling began by discussing Balversa but then quickly shifted to SG, which Mr. Conkling discussed at length. He then proposed an arrangement by which Immunomedics would offer heavily-discounted pricing of SG directly to FCS, rather than selling the drug through FCS's group purchasing organization, called ION, which would have to report all pricing to the government. Mr. Conkling stated he was proposing this arrangement because it would avoid other large Oncology groups from knowing about and asking for the same price Immunomedics had offered FCS. The FCS representatives stopped Mr. Conkling and said the proposed arrangement was clearly illegal and that FCS wanted to use the usual method of purchasing through ION and having all discounts and pricing be documented by ION.

75.     Mr. Conkling then changed tack, asking the FCS and AON representatives whether there were another way Immunomedics could offer SG to FCS at a discounted rate that would not be public. The FCS representatives again stopped Mr. Conkling, informing him that proposals like

the one Mr. Conkling proposed were the "exact reason Medicare's ASP system was developed."[5] When Mr. Conkling attempted a third time to make SG pricing more favorable to FCS than other oncology centers, the FCS representatives interrupted him, stating that FCS "play[s] by the normal rules."  The meeting ended with visible discomfort on the part of the FCS/AON representatives.

76.     Following the meeting, Plaintiff Vigie gave Mr. Conkling a ride in his car. Plaintiff Vigie informed Mr. Conkling that his proposals had been "out of bounds" as they clearly were an effort to sidestep the ASP drug-pricing system. Mr. Conkling reiterated that as soon as he gave FCS a discount for SG, he would have to give similar discounts to other oncology groups, including Tennessee Oncology, and he was trying to prevent that.

77.     Beginning in late November 2019, Immunomedics began singling out Plaintiffs for retaliation.

78.     Prior to this time, neither Plaintiff had any performance issues, and neither had received any negative feedback about the content of their expense reports or their Veeva call logs. The only issue with expense reports experienced by Mr. Vigie prior to November 2019 was that they were at times submitted late because of a glitch in Immunomedics's system used for submitting the reports (called "Concur"), which had been discussed with Ms. Getelman at length and on multiple occasions.

79.     Beginning in November 2019, however, Ms. Getelman began scrutinizing Plaintiffs' Veeva logs and expense reports in minute detail and copying Mr. Moss and Human Resources on emails addressing every purported issue she discovered. It appeared to Plaintiff

---

[5] The Average Sales Price ("ASP") is the system used by the Centers for Medicare and Medicaid Services to base its reimbursement rates for drugs.  "The ASP represents the drug manufacturer's total sales divided by the total number of units sold during a particular quarter. The total sales figure is adjusted to account for any price concessions, discounts, or rebates." *United States ex rel. Omni Healthcare Inc. v. McKesson Corp.*, No. 12-cv-6440, 2019 U.S. Dist. LEXIS 17574, at *16-17 (E.D.N.Y. Feb. 4, 2019)

Seelhorst that Ms. Getelman was building a timeline around his travel, his Veeva calls, and his expenses to manufacture a reason to terminate his employment. Because, as set forth above, Immunomedics required sales representatives to enter false information about "in person" calls into Veeva, a timeline showing discrepancies between Veeva calls and expense reports could be created for any representative.

80.     On December 3, 2019, Mr. Seelhorst was asked to have a one-on-one call with Ms. Getelman. When he joined the call, he was surprised to learn that Mr. Moss was also on the line. During the call, Ms. Getelman interrogated Mr. Seelhorst about a call he had logged on Veeva for one Dr. David Reisman who, Ms. Getelman stated, had left the practice when the call had supposedly been made. Mr. Seelhorst explained that the practice was a "no see" account and the logged call had consisted of him dropping off literature for Dr. Reisman, who he had not realized had left the practice.

81.     On December 4, 2019, Mr. Vigie was similarly ambushed by Ms. Getelman and Mr. Moss and interrogated about calls in June 2019 on a small "no see" office in rural Georgia. Specifically, Ms. Getelman inquired why Mr. Vigie's Veeva logs, gas records, and expense reports did not align as to his logged calls on that office.

82.     After this call, Mr. Vigie contacted Ms. Warner to explain that he suspected that Ms. Getelman and Mr. Moss were compiling a record of the discrepancies in the systems to use to retaliate against him for his complaints (a possibility he had specifically raised with Ms. Warner in August 2019). Rather than protecting him (as she had promised to do) Ms. Warner instead informed Mr. Vigie that she was aware of Ms. Getelman's actions and implied that any inaccuracies in his reports were his own problem.

83.     On December 23, 2019, Mr. Seelhorst received multiple emails from Ms. Getelman (on which she copied Human Resources and Mr. Moss) disapproving certain of his claimed expenses and requesting more information for others. Many of the complaints revolved around the fact that he had included the names, but not the physical addresses of various healthcare professionals. Until that time, over the course of Mr. Seelhorst's entire employment with Immunomedics, Ms. Getelman had approved without comment numerous of expense reports that did not contain physical addresses. In another email, Ms. Getelman criticized Mr. Seelhorst and asked him to remove an expense for a doctor who, she stated, had not sign a sign-in sheet. Mr. Seelhorst responded that the doctor had, in fact, signed the sheet and directed her to the location of his signature. Ms. Getelman also criticized Mr. Seelhorst for a $17 charge he had incurred at a location over one-hundred miles from his home on a day that he did not have an overnight stay away from home.  Mr. Seelhorst explained that, as he had notified Ms. Getelman and Mr. Moss in prior communications, that expense was incurred on a day when Mr. Seelhorst's wife had suffered an injury that required emergency surgery, which forced Mr. Seelhorst to cancel his hotel, return home, and take the following day off. Finally, Ms. Getelman inquired about the propriety of his travels on Sunday nights for Monday morning meetings that were entirely appropriate under Company policy.

84.     On January 9, 2020, Immunomedics terminated Plaintiffs' employment, effective immediately. Ms. Warner and Mr. Conkling participated in the telephone calls in which Plaintiffs were informed they were to be terminated.

85.     In the call informing Mr. Seelhorst of his termination, Ms. Getelman stated that he had been fired because of violations of the Company's travel and entertainment policies. When Mr. Seelhorst inquired about what the specific violations were, she declined to answer. In a

termination letter sent to Plaintiff Seelhorst, Mr. Moss stated that his termination was "based on performance issues, including your failure to comply with Company policies and guidance."

86.    Mr. Vigie was informed by Ms. Getelman that his termination was because of inaccuracies on his expense reports and his failure to manage his Veeva call list adequately or hit his call targets. Despite the fact that he was informed that these purported deficiencies had occurred for the whole year, the first time any such issues had been raised with him was in November 2019.

87.    The only clarification Mr. Vigie was given as to the purported deficiencies in his expense reports was that his reports needed to include "itemized receipts" for any purchases over $25. But pursuant to Immunomedics's stated policy, "itemized receipts" were required only for purchases over $75, while purchases of $25 or more needed only a receipt (not an "itemized" one).

88.    With respect to Mr. Vigie's Veeva calls and call targets, he had explained to Ms. Getelman in a December 31, 2019 email that while he had met all his required targets and recorded them accurately in the Veeva system, his latest Oncology Account Manager Report ("OAM Report"), which was supposed to track his Veeva calls, was highly inaccurate.

89.    The purpose of the OAM Reports was to track, on a weekly basis, the representatives' adherence to the call list targets using the information the representatives logged in Veeva. The OAM Reports, however, were extremely inaccurate and contained many inconsistencies with the Veeva information. Specifically, it was common for a representative's OAM Report to include physicians that had retired or moved out of the territory, which meant that they did not appear in Veeva.

90.    For example, according Plaintiff Vigie's final OAM Report with which Ms. Getelman took issue, he had failed to call on two doctors – Linda Straub and Teresa Coleman. But Linda Straub had moved to a different territory in North Carolina (which Mr. Vigie had informed

Immunomedics about in July 2019). And Teresa Coleman had left her practice. Crucially, neither doctor appeared on Mr. Vigie's Veeva list, meaning that he could not log calls on them even if he had the ability to see them (which he did not).

91.    Prior to Mr. Vigie's termination, discrepancies between representatives' Veeva call lists and their weekly OAM Reports had been repeatedly raised with sales leadership, including Ms. Getelman and Mr. Moss.

92.    Upon information and belief, discrepancies on expense reports and Veeva logs were commonplace among the Immunomedics sales force because of the reasons described above – the Company forced sales representatives to represent on Veeva that they were making "in-person" calls to maintain the façade that it was performing its detailing duties under the Janssen Agreement. In addition, multiple sales representatives have confirmed to Plaintiffs that, as Immunomedics required, they entered inaccurate information on Veeva to make it appear that the Company was meeting the terms of the Janssen contract.

93.    For example, in December 2019, Immunomedics's Oncology National Accounts Manager, who had been promoted to that position from a sales representative position, informed Mr. Seelhorst that he had been ordered by his superiors at Immunomedics to log numerous calls in Veeva as if he were still visiting physicians in Texas while, at the very time those calls were purportedly made, he had actually been on the road or working in his new position in New Jersey. Mr. Douglas stated that although he really did not like "lying," he had entered the false Veeva calls "under duress" because he was a "good soldier." Finally, he acknowledged that another Immunomedics Regional Business Director was "super liberal" about Veeva calls, instructing him to record emails to doctors as "calls" on the Veeva system.

94.     Moreover, Ms. Getelman herself actively engaged in conduct significantly more egregious than that which Immunomedics falsely accused Plaintiffs of perpetrating. Namely, Ms. Getelman repeatedly required her subordinates, including Plaintiffs, to cover the costs of her meals and entertainment incurred during meetings and include those amounts on their expense reports, in clear contravention of Immunomedics's policy of requiring that all meeting costs incurred be expensed by the highest-ranking member of the organization in attendance. During a January 2019 live team meeting in Miami, for example, Ms. Getelman repeatedly required all members of the team to split and individually expense meal and entertainment costs incurred during the meeting so that she could approve the expenses without involving anyone else at Immunomedics, thereby circumventing the Company's expense tracking system and approval process.

95.     Upon information and belief, Plaintiffs were the only two sales representatives whose expense reports and Veeva calls were subjected to such scrutiny.

96.     Moreover, at the end of 2019, shortly before Plaintiffs were terminated, the Company as a whole had attained only 53% of its expected performance for Balversa sales in 2019.

97.     Immunomedics's retaliation against Plaintiffs remains ongoing. Both Plaintiffs have learned from their former teammates at Immunomedics that, following their termination, Ms. Getelman informed the team that Plaintiffs were a "cancer," and the team could now move forward without them.

98.     In April 2020, the FDA approved SG, which is now known as Trodelvy.

99.     In October 2020, Immunomedics was purchased by Gilead Sciences, Inc.

100.     In October 2021, Plaintiffs asserted the claims set forth herein in an arbitration proceeding before the American Arbitration Association pursuant to an arbitration agreement between the parties.

101.    Plaintiffs seek a stay of this lawsuit pursuant to the Federal Arbitration Act, 9 U.S.C. § 3, until the arbitration has been completed and/or the Court's assistance is required during the course of the arbitration.  *See Lloyd v. Hovensa*, 369 F.3d 263, 270 (3d Cir. 2004) (holding that the court "has a significant role to play" even when claims are arbitrated as the parties "may seek the Court's assistance during the course of arbitration" and "may ask the court to compel the attendance of witnesses, or to punish the witnesses for contempt").

### FIRST CLAIM FOR RELIEF
**(Retaliation in Violation of the False Claims Act, 31 U.S.C. § 3730(h))**
**(Brought by Plaintiffs Against Immunomedics)**

102.    Plaintiffs reallege and incorporate by reference all previous paragraphs.

103.    The Anti-Kickback Statute ("AKS") prohibits the payment and receipt of kickbacks in return for either procuring or recommending the procurement of a good, facility, or item to be paid in whole or in part by a federal healthcare program.  42 U.S.C. § 1320a-7b(b).

104.    Compliance with the AKS is a condition of receiving payment from federally-funded healthcare programs, including Medicare.

105.    A "claim that includes items or services resulting from a violation of" the AKS "constitutes a false or fraudulent claim for purposes of" the federal False Claims Act ("FCA").  42 U.S.C. § 1320a-7b(g).

106.    The FCA imposes liability on any person who knowingly presents or causes to be presented a "false or fraudulent claim for payment or approval" by the federal government, or who "conspires" to have such a false claim presented.  31 U.S.C. § 3729(a)(1)(A), (C).

107.    The FCA anti-retaliation provision prohibits an employer from discriminating in any manner against an employee because of his "efforts to stop 1 or more violations of" the FCA. 31 U.S.C. § 3730(h).

108.    Upon information and belief, a large percentage of the population of patients who are prescribed Balversa are elderly and/or disabled individuals covered by Medicare, Medicaid, or other federally-funded healthcare programs.

109.    Similarly, a large percentage of the target population who would be prescribed SG are elderly and/or disabled individuals covered by Medicare, Medicaid, or other federally-funded healthcare programs.

110.    In its public SEC filings, Immunomedics acknowledges that its operations are directly or indirectly subject to the federal AKS and the federal False Claims Act

111.    Here, Plaintiffs reasonably and in good faith believed that the practices of off-label marketing SG, marketing SG prior to its approval by the FDA, pressuring sales representatives to sponsor events they could not attend, seeking to promote SG and Balversa in the presence of an MSL who must be "walled off" from sales and marketing activities, composing the Balversa call lists in a manner that promoted off-label marketing, pressuring sales representatives to fraudulently register at conferences as "attendees" rather than "vendors," directing sales representatives to log false "in-person" calls on Veeva, sneaking into hospitals and other medical facilities to market Balversa and SG without obtaining the proper credentials, requiring sales representatives to be present during pricing and contracting discussions, and efforts to circumvent the APS system by offer private discounts for SG to FCS, constituted violations of the FCA and/or are illegal kickbacks in violation of the AKS.

112.    Plaintiffs engaged in protected activity under the FCA when they opposed and attempted to put a stop to these illegal sales practices, including by reporting them to their superiors Warner and Conkling.

113.    Immunomedics's campaign of reprisal against Plaintiffs by scrutinizing their expense reports and Veeva calls (knowing that discrepancies would exist because of Immunomedics's directive that representatives log false information), and then terminating their employment when discrepancies were inevitably discovered, constitutes illegal retaliation for Plaintiffs' protected activity under the FCA.

114.    Defendant's conduct was intentional deliberate, willful, and conducted in callous disregard for Plaintiffs' protected rights.

115.    As a direct and proximate result of Defendant's illegal conduct, Plaintiffs have suffered and will continue to suffer harm, and are entitled to all equitable and legal remedies available under the FCA, including, but not limited to, reinstatement, restoration of benefits, an award of two times the amount of back pay, front pay, compensatory damages for emotional distress, punitive damages, attorneys' fees and costs, and such other legal and equitable relief as this tribunal deems just and proper.

### SECOND CLAIM FOR RELIEF
**(Retaliation in Violation of Florida's Private Whistleblower Protection Act)**
**(Brought by Plaintiff Vigie against Defendant Immunomedics)**

116.    Plaintiffs reallege and incorporate by reference all previous paragraphs.

117.    The Florida Private Whistleblower Protection Act ("FPWPA") prohibits employers from taking "any retaliatory action against an employee because the employee . . . [o]bjected to, or refused to participate in, any activity, policy, or practice which is in violation of a law, rule, or regulation."  Fla. Stat. § 448.102.

118.    Numerous acts of Ms. Getleman and Immunomedics were in violation of laws, rules, and regulations. First, Ms. Getelman's marketing of SG to doctors and pressuring sales representatives (including Plaintiffs) to market SG to doctors before SG was approved by the FDA for any medical use violated the Public Health Service Act, 42 U.S.C. § 262, which requires

biologic manufacturers from marketing biologic products before FDA approval. Second, Ms. Getelman's practices of sneaking into conferences without paying attendance fees and pressuring sales representatives to register as "attendees" rather than "vendors" at conferences (which cost thousands of dollars more), constitute acts of fraud and/or theft of services and/or solicitation of fraud or theft of services, in violation of various state criminal and civil statutes. *See, e.g.*, N.J.S.A. § 2C:20-8; Fla. Stat. §§ 812.012, 812.014; Ala. Code § 13A-8-10. Third, as described above, a number of Immunomedics's and Ms. Getelman's practices violate the AKS and/or FCA. Finally, Immunomedics's practice of directing its sales representatives to log non-face-to-face interactions as "in-person" meetings to meet its obligations under the Janssen Agreement constitutes common law fraud and/or fraud in the performance of the Agreement

119.    Plaintiff Vigie engaged in protected activity under the FPWPA when he objected to and complained to his superiors, including Ms. Warner and Mr. Conkling, about the above practices.

120.    Defendant's campaign of reprisal against Plaintiff Vigie by scrutinizing his expense reports and Veeva calls (knowing that discrepancies would exist because of Immunomedics's directive that representatives log false information), and then terminating his employment when discrepancies were inevitably discovered, constitutes illegal retaliation for Plaintiff Vigie's protected activity under the FPWPA.

121.    Defendant's conduct was intentional deliberate, willful, and conducted in callous disregard for Plaintiff Vigie's protected rights.

122.    As a direct and proximate result of Defendant's illegal retaliation, Plaintiff Vigie has suffered and will continue to suffer harm and is entitled to all equitable and legal remedies available under the FPWPA including, but not limited to: reinstatement, restoration of benefits,

back pay, front pay, compensatory and punitive damages, attorneys' fees and costs, and such other legal and equitable relief as this tribunal deems just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendant as follows:

(A)      For compensatory and punitive damages in an amount to be determined by the trier of fact;

(B)      For statutory damages and penalties in amounts to be determined by the trier of fact;

(C)      For reasonable attorneys' fees, interest, and costs of suit;

(D)      For such other and further relief as the Court may deem just and equitable.

Dated: New York, New York
      January 8, 2022

Respectfully submitted,
JOSEPH & KIRSCHENBAUM LLP

By:  _s/Lucas Buzzard_____
     D. Maimon Kirschenbaum
     Lucas C. Buzzard
     32 Broadway, Suite 601
     New York, NY 10004
     Tel: (212) 688-5640
     Fax: (212) 688-2548